**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

AMANDIP K.,[1]                           ) Case No. EDCV 19-1346-JPR
                                         )
                    Plaintiff,           )
                                         )
          v.                             ) **MEMORANDUM DECISION AND ORDER**
                                         ) **AFFIRMING COMMISSIONER**
ANDREW SAUL, Commissioner                )
of Social Security,                      )
                                         )
                    Defendant.           )
_____          )

**I.    PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision

denying her application for Social Security disability insurance

benefits ("DIB").   The matter is before the Court on the parties'

Joint Stipulation, filed June 8, 2020, which the Court has taken

under submission without oral argument.   For the reasons stated

below, the Court recommends that the Commissioner's decision be

affirmed.

_____

     [1] Plaintiff's name is partially redacted in line with
Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
recommendation of the Committee on Court Administration and Case
Management of the Judicial Conference of the United States.

1

1    **II.   BACKGROUND**

2         Plaintiff was born in 1976.  (Administrative Record ("AR")

3    167.)  She completed high school (AR 171) and worked as a

4    warehouse supervisor (AR 54, 159).  On November 13, 2015, she

5    applied for DIB, alleging that she had been unable to work since

6    September 27, 2013 (AR 186), because of back, leg, feet, and neck

7    pain (AR 170).

8         After her application was denied initially (AR 79-82) and on

9    reconsideration (AR 86-91), she requested a hearing before an

10   Administrative Law Judge (AR 92-97).  A hearing was held on

11   August 28, 2018, at which Plaintiff, represented by counsel,

12   testified, as did a vocational expert.  (AR 31-58.)  In a written

13   decision issued September 14, 2018, the ALJ found her not

14   disabled.  (AR 12-30.)  On September 19, 2018, she requested that

15   the Appeals Council review the ALJ's decision.  (AR 147-49.)  On

16   June 6, 2019, the Appeals Council denied her request for review.

17   (AR 1-6.)  This action followed.

18   **III. STANDARD OF REVIEW**

19        Under 42 U.S.C. § 405(g), a district court may review the

20   Commissioner's decision to deny benefits.  The ALJ's findings and

21   decision should be upheld if they are free of legal error and

22   supported by substantial evidence based on the record as a whole.

23   See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.

24   Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence

25   means such evidence as a reasonable person might accept as

26   adequate to support a conclusion.  Richardson, 402 U.S. at 401;

27   Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It

28   is "more than a mere scintilla, but less than a preponderance."

Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the
meaning of 'substantial' in other contexts, the threshold for
such evidentiary sufficiency is not high."  Biestek v. Berryhill,
139 S. Ct. 1148, 1154 (2019).  To determine whether substantial
evidence supports a finding, the court "must review the
administrative record as a whole, weighing both the evidence that
supports and the evidence that detracts from the Commissioner's
conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.
1998).  "If the evidence can reasonably support either affirming
or reversing," the reviewing court "may not substitute its
judgment" for the Commissioner's.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.   The Five-Step Evaluation Process

An ALJ follows a five-step sequential evaluation process to
assess whether someone is disabled.  20 C.F.R. § 404.1520(a)(4);
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as
amended Apr. 9, 1996).  In the first step, the Commissioner must
determine whether the claimant is currently engaged in
substantial gainful activity; if so, the claimant is not disabled
and the claim must be denied.  § 404.1520(a)(4)(i).

3

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 404.1520(a)(4)(ii) & (c).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal one in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, she is not disabled and the claim must be denied.  § 404.1520(a)(4)(iv).  The claimant has the burden of proving she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.

If that happens or if the claimant has no past relevant

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 404.1545(a)(1); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  The Commissioner assesses the claimant's RFC between steps three and four.  Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

work, the Commissioner bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy, the fifth and final step of the sequential analysis. §§ 404.1520(a)(4)(v), 404.1560(b).

   B.   The ALJ's Application of the Five-Step Process

   At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 27, 2013, the alleged onset date.  (AR 17.)  Her date last insured was December 31, 2019.  (Id.)  At step two, she determined that Plaintiff had severe impairments of "degenerative disc disease of the lumbar spine," "spondylosis with sciatica," and "bilateral venous insufficiency."  (Id.)  She concluded that her depression was not severe because it did "not cause more than minimal limitation in [her] ability to perform basic mental work activities."  (AR 18.) At step three, she found that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (AR 18-19.) At step four, she determined that she had the RFC to perform light work except that she could not "push or pull with the right lower extremity"; could "occasionally climb ramps and stairs," "stoop, kneel, crouch and crawl"; could "never climb ladders, ropes, or scaffolds"; and was "limited to simple tasks due to pain."  (AR 19.)  The ALJ concluded that Plaintiff was unable to perform her past relevant work but could work as a hotel housekeeper, cashier II, or fast-food worker, positions that "exist[ed] in significant numbers in the national economy."  (AR 25; see AR 24-26.)  Accordingly, she found her not disabled.  (AR 26.)

**V.    DISCUSSION**

Plaintiff alleges that the ALJ erred in assessing her RFC and her symptom statements.  (See J. Stip. at 4-9, 15-18.)   For the reasons discussed below, remand is not warranted.

A.    Medical Opinions and Evidence

1.    Wayne Cheng

On April 24, 2013, Plaintiff saw Dr. Wayne Cheng,[3] complaining of "[r]ight thigh pain." (AR 283.)   Dr. Cheng noted that she had done well "from [a] 3 level" lumbar fusion in 2010 but "now ha[d] right hamstring, piriformis[4] and lateral thigh pain" (AR 284); "lying down" provided her "[o]nly relief" (id.). He instructed her to "try [C]elebrex"[5] and physical therapy. (Id.)

Plaintiff reported on June 17, 2013, that "a few sessions" of physical therapy "did not help," she "did not take the Celebrex due to insurance reasons," she was in "so much pain she [couldn't] function, she [was] embarrassed at work" because "she

_____

[3] Dr. Cheng primarily practices spine surgery.  See Cal. Dep't Consumer Aff. License Search, https://search.dca.ca.gov (search for "Wayne" with "Cheng" under "License Type," "Physicians and Surgeons") (last visited Feb. 22, 2021).

[4] The piriformis muscle is a flat, bandlike muscle located in the buttocks near the top of the hip joint.  See Piriformis Syndrome, WebMD, https://www.webmd.com/pain-management/guide/piriformis-syndrome-causes-symptoms-treatments#1 (last visited Feb. 22, 2021).

[5] Celebrex is name-brand celecoxib, a nonsteroidal anti-inflammatory used to relieve pain, tenderness, swelling, and stiffness caused by arthritis and spondylitis.  See Celecoxib, MedlinePlus, https://www.medlineplus.gov/druginfo/meds/a699022.html (last visited Feb. 22, 2021).

1 [was] always in pain," "she [was] in her bed" "[w]hen . . . not
2 at work," her "leg . . . at times 'fe[lt] like [it was] broken,'"
3 and she was "sedentary [and did] not exercise due to the pain."
4 (AR 296.)  A new MRI of her lumbar spine and an EMG and bone scan
5 of her right lower leg were ordered.  (AR 297.)

6      On July 3, 2013, Plaintiff complained of "right buttock
7 pain, right thigh pain and pain in the middle of her right shin
8 and now starting in her left shin." (AR 302.)  It was "worse
9 with sitting/standing/walking," but she found "relief with lying
10 down" and with "Norco/[L]ortab."[6]  (Id.)  Plaintiff had "[n]o
11 pain" with the FABERE test.[7]  (AR 303.)  A physician's assistant
12 noted that Dr. Cheng had reviewed a June 25 bone scan and MRI and
13 that they showed a "[s]mall posterior disc bulge at L2-3 and
14 right foraminal disc bulge at L3-4." (Id.)  Physical therapy and
15 a Flector patch[8] were prescribed.  (AR 304.)

16      Plaintiff saw Dr. Cheng's physician's assistant on October
17 21, 2013, for "follow up on her bilateral lower extremity pain."

18

---

19      [6] Norco and Lortab are opioid-based medications for treating
20 moderate to severe pain, consisting of hydrocodone and
   acetaminophen.  See Norco, WebMD, https://www.webmd.com/drugs/
21 2/drug-63 /norco-oral/details (last visited Feb. 22, 2021);
   Hydrocodone-Acetaminophen, WebMD, https://www.webmd.com/drugs/2/
22 drug-251/hydrocodone-acetaminophen-oral/details (last visited
   Feb. 22, 2021).
23

24      [7] The Patrick, or FABERE, test measures pain or dysfunction
   in the hip and sacroiliac joints.  Patrick Test, The Free
25 Dictionary, http://medical-dictionary.thefreedictionary.com/
   Patrick+test (last visited Feb. 22, 2021).
26

27      [8] Flector is a brand of diclofenac-transdermal patch used to
   treat pain from minor strains, sprains, and bruises.  Diclofenac
28 Transdermal Patch, MedlinePlus, https://medlineplus.gov/
   druginfo/meds/a611001.html (last visited Feb. 22, 2021).

1    (AR 210.)  She "denie[d] any back" pain and reported that "her
2    right lateral thigh pain ha[d] improved" with physical therapy
3    and that "the compression stockings . . . ha[d] really helped her
4    leg pain," but "[s]he continue[d] to have bilateral shin pain."
5    (Id.)  She was encouraged to follow up with another doctor
6    concerning "possible venous insufficiency," have an "EMG
7    completed," and get a "second opinion [about] her back."  (AR
8    211.)

9        On November 27, 2013, Plaintiff saw Dr. Cheng for "follow up
10   on her bilateral lower extremity pain."  (AR 212.)  He noted that
11   she had done "fine for a couple of years" following her 2010
12   lumbar fusion.  (Id.)  She reported that in the "last year her
13   leg pain ha[d] been progressively getting worse" and that she had
14   "not been able to work due to her pain."  (Id.)  She "denie[d]
15   any back" pain and reported that "her right lateral thigh pain
16   ha[d] improved" with physical therapy, but she "continue[d] to
17   have bilateral shin pain."  (Id.)  She was being treated for
18   "possible venous insufficiency" and had been wearing the
19   recommended compression stockings, which "really helped her leg
20   pain out."  (Id.)  Dr. Cheng noted that the June 25, 2013 MRI
21   showed "[i]nterval placement of anterior stabilization hardware
22   and disc spacers at L3-4, L4-5, and L5-S1" and a "[s]mall
23   posterior disc bulge at L2-3 and right foraminal disc bulge at
24   L3-4," but "[n]o central spinal stenosis or significant neural
25   foraminal narrowing."  (AR 213.)  He diagnosed "[n]europathy,"
26   "[l]ow back pain radiating to both legs," "[l]umbar spondylosis,"
27   "[d]egenerative disc disease," and "[l]umbago."  (Id.)  He opined
28   that her "bilateral leg pain [was] not coming from her back" and

that "no further surgical intervention [was] warranted." (AR 214.) He encouraged her to follow her treatment for "possible venous insufficiency" and "start on [L]yrica[9] . . . for pain." (Id.) He also "discussed [a] spinal cord stimulator" with her, but she "really [did] not want anything foreign in her body." (Id.)

Plaintiff reported on January 27, 2014, that she "continue[d] to have bilateral shin pain," the "compression stockings . . . [had] only helped out for a little," "Lyrica . . . [had] not help[ed]," "she felt depressed and tired," and "she ha[d] been out of work . . . for 4 months due to her leg pain." (AR 217.) But she "denie[d] any back" pain. (Id.) The physician's assistant noted that the EMG "show[ed] neuropathy vs [p]olyneuropathy"; Plaintiff had "min[imum b]ack pain," and the "[m]ajority of [her] pain [was] from [her] legs." (AR 218.) The physician's assistant "suggest[ed that she] start on [L]yrica" and "discussed [a] spinal cord stimulator" with her. (Id.) A new MRI of the lumbar spine was ordered "to rule out spinal stenosis," and she was referred "to pain management for a spinal stimulator" and instructed to "be off work for another 6 weeks." (AR 219.)

    2.  <u>Gilbert P. Eng</u>

Plaintiff saw Dr. Gilbert P. Eng[10] on May 7, 2013, for a

_____

[9] Lyrica treats pain and certain types of seizures. <u>See</u> <u>Lyrica</u>, WebMD, https://www.webmd.com/drugs/2/drug-93965/lyrica-oral/details (last visited Feb. 22, 2021).

[10] Dr. Eng primarily practices internal medicine. <u>See</u> Cal. Dep't Consumer Aff. License Search, https://search.dca.ca.gov
(continued...)

"[r]outine general medical examination." (AR 292.) He diagnosed "[e]sophageal reflux," "[l]umbago," "[d]egenerative disc disease," and "[o]besity, unspecified." (AR 290.) He noted that she was currently prescribed Celebrex, Nexium,[11] and Lortab (id.); he ordered a urinalysis and blood work (AR 292).

### 3. Lucas Korcek

Plaintiff saw Dr. Lucas Korcek[12] on August 26, 2013, complaining of "pain in [her right] buttocks, [right] thigh[,] and [both] shins." (AR 308.) She reported that her "[p]ain [was] focused mostly over" her bilateral "anterior lower leg" and was "aggravated with standing/walking and relieved with rest." (Id.) She got "relief with lying down" and with "Norco/[L]ortab" and "denie[d] any associated back pain/leg weakness/decreased leg sensation/edema." (Id.) An examination that day showed "[n]o pain" with the FABERE test, "[n]o sensory deficits" in the bilateral lower extremities, "[n]o edema," "2+" foot pulses, and "5/5 hip flexion/knee extension/ankle dorsiflexion/great toe extension/ankle planar flexion" bilaterally. (AR 309.) Dr. Korcek noted that there was "[n]o clear etiology for

---

[10] (...continued)
(search for "Gilbert P." with "Eng" under "License Type," "Physicians and Surgeons") (last visited Feb. 22, 2021).

[11] Nexium treats stomach and esophagus problems by decreasing the amount of acid made by the stomach. See Nexium Capsule, Delayed Release, WebMD, https://www.webmd.com/drugs/2/drug-20536/nexium-oral/details (last visited Feb. 22, 2021).

[12] Dr. Korcek primarily practices orthopedic surgery. See Cal. Dep't Consumer Aff. License Search, https://search.dca.ca.gov (search for "Lucas" with "Korcek" under "License Type," "Physicians and Surgeons") (last visited Feb. 22, 2021).

[Plaintiff's] pain," prescribed stretching exercises and swimming, gave her a "temporary 4 hour work restriction," and referred her to a sports-medicine doctor and a pain-management clinic.  (AR 310.)

### 4.   Cole W. Robinson

On September 5, 2013, Plaintiff saw Dr. Cole W. Robinson,[13] complaining of "bil[ateral] leg pain" and "left>right anterior shin leg pain" that had started one year before after exercising and "would resolve with rest/massage[] and raising the limb." (AR 314.)  She reported that the pain "always resolve[d] after 1-2 hours" and "seem[ed] to radiate proximally to the lateral portion of her left knee, but . . . the radiating pain was not severe."  (Id.)  She had "stopped walking for exercise," but "the pain [was] now present with the activities associated with her job."  (Id.)  Dr. Robinson noted that her "presentation [was] most consistent with chronic anterior compartment syndrome" and instructed her to return "for compartment pressure measurements . . . before and after exercise."  (AR 316.)

### 5.   Christopher M. Jobe

On September 17, 2013, Plaintiff saw Dr. Christopher M. Jobe,[14] who noted that "[a]fter reviewing [her] symptoms and

---

[13] Dr. Robinson primarily practices pain medicine.  See Cal. Dep't Consumer Aff. License Search, https://search.dca.ca.gov (search for "Cole W." with "Robinson" under "License Type," "Physicians and Surgeons") (last visited Feb. 22, 2021).

[14] Dr. Jobe primarily practices orthopedic surgery.  See Cal. Dep't Consumer Aff. License Search, https:// search.dca.ca.gov (search for "Christopher M." with "Jobe" under "License Type," "Physicians and Surgeons") (last visited Feb. 22, (continued...)

1  physical exam, [he] believ[ed] that her problem [was] venous
2  congestion in the legs." (AR 209; see AR 321.) He instructed
3  her to use compression stockings. (AR 209, 321.)

4         6.  Gurvinder Uppal

5      On October 22, 2013, Plaintiff saw othopedist Gurvinder
6  Uppal for low-back pain. (AR 455.) Dr. Uppal noted that an MRI
7  before her fusion surgery showed "a herniated disc at L3-4 [and]
8  L4-5 and collapse of the L5-S1 disc space." (Id.) An MRI
9  performed after the surgery showed "adequate position of the
10 hardware." (Id.) A bone scan was "negative for any fractures or
11 infections." (Id.) Plaintiff reported that she was taking "six+
12 Norco or Lortab a day" when she was working, but since she was no
13 longer working she was "tak[ing] maybe one." (Id.) She had
14 "normal balance" and "[n]o gross muscle weakness." (Id.) An
15 examination showed "60 degrees of flexion and 10 degrees of
16 extension,"[15] a negative straight-leg-raise test,[16] and "5/5"
17 muscle strength of the ankle dorsi, plantar flexors, quadriceps,

18
19
20

21     [14] (...continued)
    2021).

22
23     [15] Normal lumbar-spine range of motion is 60 degrees of
    flexion and 25 degrees of extension. See Range of Motion,
    Chiro.Org, https://chiro.org/forms/romchiro.html (last visited
24   Feb. 22, 2021).

25     [16] A straight-leg-raise test involves mechanical
26 manipulation of the legs, stressing the neurological tissues in
   the spine; specific symptoms reported at different degrees of
27 flexion can indicate nerve compression. See The Pain Clinic
   Manual 44-45 (Stephen E. Abram & J. David Haddox eds., 2d ed.
28 2000).

1  and iliopsoas.[17]   (AR 456.)   Dr. Uppal instructed her to continue

2  stretching exercises and noted that he was "placing her on

3  temporary disability."   (Id.)

4       Dr. Uppal noted at a March 25, 2014 follow-up visit that

5  Plaintiff had "had EMG/NCV studies done" that were "consistent

6  with abnormalities, but not diagnostic."   (AR 457.)   He opined

7  that the abnormalities were "consistent with changes from [her]

8  previous surgery."   (Id.)   She had "normal balance" and "[n]o

9  gross muscle weakness."   (Id.)   She exhibited "spasms" "[o]n

10  examination."   (Id.)   But she had "60 degrees flexion and 10

11  extension"; a negative straight-leg-raise test; and "5/5" muscle

12  strength in the ankle dorsi, plantar flexors, quadriceps, and

13  iliopsoas.   (Id.)   Dr. Uppal noted that he was "giving her a

14  disability note for six months" and that he didn't "feel she

15  [could] go back to work" because she was "on pain medicine and

16  [was] having significant spasms in her low back."   (AR 458.)

17       On September 23, 2014, Plaintiff saw Dr. Uppal for low-back

18  and "bilateral buttock pain."   (AR 459.)   She had "normal

19  balance" and "[n]o gross muscle weakness."   (Id.)   She again

20  exhibited "60 degrees flexion and 10 extension"; a negative

21  straight-leg-raise test; and "5/5" muscle strength in the ankle

22  dorsi, plantar flexors, quadriceps, and iliopsoas.   (Id.)   Dr.

23  Uppal instructed her to "[c]ontinue home stretching exercises"

24  and noted that "[s]he [was] placed on disability."   (AR 460.)

25

26       [17] The iliopsoas muscle is part of a group of muscles known

27  as the hip flexors.   See Hip Flexor Strain — Aftercare,
   MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/

28  patientinstructions/000682.htm (last visited Feb. 22, 2021).

1    During a February 10, 2015 follow-up visit, Plaintiff
2  reported that she was "having more and more back and leg pain" in
3  the "low back, posterior buttock, thigh, calf[, and] all the way
4  to the feet." (AR 461.)  Examination again showed "normal
5  balance," "[n]o gross muscle weakness," "60 degrees flexion and
6  10 extension," a negative straight-leg-raise test, and "5/5"
7  muscle strength in the ankle dorsi, plantar flexors, quadriceps,
8  and iliopsoas. (Id.)  Dr. Uppal recommended a "CAT scan to
9  evaluate if there [was] any stenosis and spondylosis." (AR 462.)
10 He gave "her an off work note for another four weeks," noting
11 that he did "not feel she [could] do any significant bending,
12 stooping, [or] lifting" and that she was "on Norco which causes
13 further depression and lack of concentration." (Id.)

14    Dr. Uppal noted during a May 12, 2015 follow-up visit that a
15 report of a recent "myelogram and CAT scan of the lumbar spine"
16 showed "a 3 mm bulging disc at . . . L2-3." (AR 463.)  He opined
17 that "the reason she [was] having pain [was] because of adjacent
18 level degenerative changes because she ha[d] had L3-4, L4-5 and
19 L5-S1 decompression and fusion." (Id.)  Her examination findings
20 were unchanged, except she had a positive straight-leg-raise
21 test. (AR 463-64.)  Dr. Uppal noted that he wanted to see the
22 films from the myelogram and CAT scan and that she was "continued
23 on her disability." (AR 464.)

24    On June 9, 2015, Dr. Uppal found that the "CAT scan
25 myelogram" showed "no significant stenosis." (AR 465.)
26 Plaintiff's examination showed "60 degrees of flexion and 10
27 degrees of extension," a negative straight-leg-raise test, and
28 "5/5" muscle strength in the ankle dorsi, plantar flexors,

quadriceps, and iliopsoas.  (Id.)  Dr. Uppal referred her to a
pain-management specialist, noting that she had "some thickening
of the ligamentum flavum" but "no significant stenosis."  (Id.)
He stated that "if her symptoms [got] much worse . . . she
[would] be a candidate for posterior decompression and fusion."
(Id.)  But the "risk benefit ratio [was] not [yet] in her favor."
(Id.)  He "continued [her] on disability" "because she [was] on
pain medication," "it causes too much drowsiness," and "she
[couldn't] really take" doing "a lot of activities such as
bending, stooping, [and] lifting."  (Id.)

Dr. Uppal noted during a September 8, 2015 follow-up visit
that Plaintiff was "trying to hold off" on back surgery.  (AR
466.)  Her examination findings were unchanged except she had a
positive straight-leg-raise test.  (Id.)  Dr. Uppal recommended
that she undergo epidural injections.  (AR 467.)

Plantiff reported on December 8, 2015, that she had not had
the injections because of a communication issue with scheduling
them.  (AR 468.)  Dr. Uppal noted that her "stenosis at L2-3" was
"junctional due to stress transference."  (Id.)  Her straight-
leg-raise test was negative, and the other examination findings
were unchanged.  (Id.)  Dr. Uppal again recommended that she
undergo epidural injections and "kept [her] on temporary total
disability for another three month[s]."  (Id.)

On March 8, 2016, Plaintiff reported that she "never
underwent her epidurals because she had [a] urinary tract
infection."  (AR 470.)  Dr. Uppal noted that an "[e]xamination of
[her] back reveal[ed] spasms"; she had "40 degrees of flexion and
10 degrees of extension"; the straight-leg-raise test was

1  positive; muscle strength was "5/5" for the ankle dorsi, plantar
2  flexors, quadriceps, and iliopsoas; and there was "tenderness
3  over the screw tops" hardware from her surgery. (Id.)  He
4  recommended "a lumbar corset on an as needed basis" and gave her
5  an "off-work note," noting that he did "not feel she [was] going
6  to return back to work." (AR 470-71.)

7      Dr. Uppal noted during a May 24, 2016 follow-up visit that
8  Plaintiff's "symptoms [were] more due to scarring around the
9  nerves," "she should get into pain management," and she "may need
10 to have a switch of her medications." (AR 472.)  Examination
11 showed "tenderness over the screw tops," "60 degrees of flexion
12 and 10 degrees of extension," positive right- and negative left-
13 straight-leg-raise test, and a negative FABERE test, "which
14 indicate[d] no hip pathology." (Id.)  Dr. Uppal recommended pain
15 management and physical therapy and noted that he would
16 "recommend . . . remov[ing] the hardware" if those measures
17 failed and she had "unacceptable symptoms." (Id.)  Plaintiff
18 "wish[ed] to hold off at [that] point." (Id.)

19          7.  Ook Kim

20     On December 17, 2013, Plaintiff saw Dr. Ook Kim[18] for a
21 medication refill and to reestablish care. (AR 214.)  Plaintiff
22 reported her pain as "5 on a scale of 0-10." (AR 215.)  Dr. Kim
23 noted that her "[d]aily physical functioning" was "good," and her
24 "[e]motional functioning" was "excellent." (Id.)  She was being

25

26     [18] Dr. Kim primarily practices internal medicine.  See Cal.
27 Dep't Consumer Aff. License Search, https://search.dca.ca.gov
   (search for "Ook" with "Kim" under "License Type," "Physicians
28 and Surgeons") (last visited Feb. 22, 2021).

16

"maintained on Lortab 7.5/500 3 tab(s) a day" (id.); she "[u]sed to take 5 tabs a day while working" but no longer needed to since being at home (id.).  Dr. Kim found her "[l]umbar spondylosis" "[p]ain controlled" with her medication and instructed her to return in three months.  (AR 216.)

Plaintiff saw Dr. Kim on July 1, 2014, for a medication refill.  (AR 222.)  She again rated her pain as "5/10," her daily physical functioning as "good," and her emotional functioning as "excellent."  (Id.)  An examination showed "no low back tenderness" and "normal, atraumatic" extremities with "no cyanosis or edema."  (AR 223.)  Dr. Kim noted "[n]o evidence[] of radiculopathy" and found Plaintiff's lumbar spondylosis "[c]ontrolled."  (AR 225.)  She adjusted the dosage of her Norco and started her on nortriptyline.[19]  (Id.)

On October 16, 2014, Plaintiff saw Dr. Kim for a medication refill and leg pain.  (AR 232.)  She denied any side effects from her medications; reported her pain as "1 on a scale of 0-10"; and said her daily physical functioning and social and emotional functioning were "excellent."  (AR 233.)  Dr. Kim found her lumbar spondylosis "[c]ontrolled" and renewed her Norco prescription.  (AR 234-35.)

Plaintiff returned to Dr. Kim on February 19, 2015, for another medication refill (AR 235) and reported that she had

_____

[19] Nortriptyline treats depression.  See Nortriptyline HCL, WebMD, https://www.webmd.com/drugs/2/drug-10710/ nortriptyline-oral/details (last visited Feb. 22, 2021).  It is occasionally used for treating neuropathic pain.  See Nortriptyline for Neuropathic Pain in Adults, NCBI, https:// www.ncbi.nlm.nih.gov/pmc/articles/PMC6485407/ (last visited Feb. 22, 2021).

"been well" (AR 236).  She rated her pain as "5 on a scale of 0-10" and said her social and emotional functioning was "good" and her daily physical functioning was "fair."  (Id.)  Dr. Kim assessed her lumbar spondylosis as "[c]ontrolled," continued her on her medication regimen, and instructed her to "[f]ollow up with orthopedics."  (AR 237.)

On June 15, 2015, Plaintiff denied back pain and rated her right-leg pain as "5-7/10" and her back pain as "1 on a scale of 0-10."  (AR 242.)  She said her social and emotional functioning was "good" and her daily physical functioning was "fair due to right buttock pain."  (Id.)  On examination, Dr. Kim noted that she had "moderate tenderness to palpation of the right buttock around the ischial tuberosity,"[20] her straight-leg-raise and FABERE tests were negative, and the neurological findings were normal.  (AR 243.)  Dr. Kim noted that Kenalog[21] injections would be scheduled for her right-buttock pain.  (AR 244.)

Plaintiff underwent a Kenalog injection on July 15, 2015. (AR 246.)  On August 13, 2015, she reported to Dr. Kim that "[h]er pain got better for a week" after the injection, but it had returned.  (AR 247.)  She rated her right-buttock pain as "5-7/10" (id.) and her back pain as "1 on a scale of 0-10" (AR 248).

_____

[20] The ischial tuberosity is a rounded bone that extends from the ischium — the curved bone that makes up the bottom of the pelvis.  See Everything You Need to Know About Your Ischial Tuberosity, Healthline, https://www.healthline.com/health/ischial-tuberosity (last visited Feb. 22, 2021).

[21] Kenalog is name-brand triamcinolone acetonide, a corticosteroid hormone that decreases swelling.  See Kenalog-40 Vial, WebMD, https://www.webmd.com/drugs/2/drug-9275/kenalog-injection/details (last visited Feb. 22, 2021).

An examination showed "moderate tenderness to palpation of the right buttock around the ischial tuberosity" and "moderate tenderness to palpation of both . . . low[er] legs" but "no swelling, erythema, or warmth." (AR 249.) Straight-leg-raise and FABERE tests were negative, and the neurological examination was normal. (Id.)

On September 10, 2015, Plaintiff rated her right buttock, leg, and back pain as "3/10." (AR 252.) She reported her social and emotional functioning as "good" and her daily physical functioning as "fair." (Id.) Dr. Kim noted for both Plaintiff's lumbar spondylosis and her right-leg pain that her "current medical regimen [was] effective." (AR 254.)

During a January 4, 2016 followup, Plaintiff rated her pain as "3 on a scale of 0-10" and denied any side effects from her medication. (AR 262.) Dr. Kim found that her "current medical regimen [was] effective," instructed her to "continue [the] plan and medications," and added "axial muscle-strengthening exercises." (AR 264.)

Plaintiff saw Dr. Kim for a medication refill on March 18, 2016. (AR 504.) She rated her pain as "3 on a scale of 0-10" and denied any side effects from her medication. (AR 505.) Dr. Kim assessed her "medical regimen" as "effective" and instructed her to "continue [the] plan and medications." (AR 507.)

On April 15, 2016, Plaintiff again rated her pain as "3 on a scale of 0-10." (AR 514.) She reported that Dr. Uppal had recommended that the hardware from her previous back surgery be removed. (Id.) Dr. Kim again noted that her "current medical regimen" for her lumbar spondylosis was "effective" and

19

instructed her to follow up with Dr. Uppal.  (AR 516.)

Plaintiff saw Dr. Kim for a followup on her back pain and radicular right-leg pain on July 20, 2016.  (AR 540.)  She rated her pain as "2 on a scale of 0-10."  (AR 541.)  Dr. Kim noted that "Dr. Chen[g] . . . [didn't] recommend surgery."  (Id.)  A neurological examination showed normal findings except "0+" on the right-achilles deep-tendon reflexes and "[d]ecreased light touch and vibration to [the] right foot through L4-S1."  (AR 542.)

On October 19, 2016, Plaintiff rated her pain as "2 on a scale of 0-10" and denied any side effects from her medication.  (AR 581.)  Her back-pain score was noted as "5."  (AR 581-82.)  Neurological examination findings were unchanged from July except her straight-leg-raise test was positive, with the right greater than the left.  (AR 583.)  Dr. Kim diagnosed "[o]steoarthritis of spine with radiculopathy, lumbar region" and noted that Plaintiff would "taper off Norco" and that it was "[u]nclear if" her leg pain was "radiculopathy or [a] shin splint given [the] normal EMG and positive" straight-leg-raise test.  (AR 584.)

8.   Ranier E. Guiang

On January 8, 2014, Plaintiff saw Ranier E. Guiang,[22] complaining of "back pain radiating down to the legs especially on the right."  (AR 626.)  She reported that Gabapentin[23] and

_____

[22] Dr. Guiang primarily practices pain medicine.  See Cal. Dep't Consumer Aff. License Search, https://search.dca.ca.gov (search for "Ranier E." with "Guiang" under "License Type," "Physicians and Surgeons") (last visited Feb. 22, 2021).

[23] Gabapentin is an anticonvulsant used sometimes to relieve
(continued...)

1  Lyrica had been ineffective for her pain (id.), and Dr. Guiang

2  recommended epidural injections (AR 627).

3      Plaintiff returned to Dr. Guiang on July 13, 2017, for

4  "lower back pain radiating to her right thigh" and "bilateral

5  shin pain." (AR 631.) Dr. Guiang prescribed Nucynta[24] and

6  epidural steroid injections. (Id.) She underwent epidural

7  injections on August 15, 2017 (AR 643), and February 27, 2018 (AR

8  674). On February 23, 2018, she reported "adequate pain relief

9  on [her] current pain regimen," with "[n]o . . . adverse

10  reactions or over sedation." (AR 669.)

11          9.  Frances Batin

12      On November 3, 2015, Plaintiff reported to Dr. Frances

13  Batin[25] that she had "been having 'bruise-like' lesions on [her]

14  legs above and below [the] knees" "for one year." (AR 447.) The

15  lesions "ha[d] never been painful" before, but the pain from "a

16  lesion on her right calf for 2 days" was "intolerable and

17  worsened with weight-bearing," "driving the car, or . . .

18  dorsiflexion at rest." (Id.) She also reported "right lower leg

19  pain for 3 years that [was] undiagnosed" and for which she took

20

21      [23] (...continued)
nerve pain. See Gabapentin, WebMD, https://www.webmd.com/

22  drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details
(last visited Feb. 22, 2021).

23

24      [24] Nucynta is used to help relieve moderate to severe short-
term pain. See Nucynta, WebMD, https://webmd.com/drugs/2/

25  drug-152563/nucynta-oral/details (last visited Feb. 22, 2021).

26      [25] Dr. Batin primarily practices internal medicine. See
Cal. Dep't Consumer Aff. License Search, https://

27  search.dca.ca.gov (search for "Frances" with "Batin" under
"License Type," "Physicians and Surgeons") (last visited Feb. 22,

28  2021).

1   Norco "every 5 hours."  (Id.)  She rated her pain "6/10 in the

2   office"[26] and "9/10" "[w]hen driving or when Norco w[ore] off."

3   (Id.)  Dr. Batin diagnosed "[m]yofascial pain in both legs" and

4   "[e]pidermal lesions likely vasculature in nature" (id.) and

5   scheduled a skin biopsy (AR 448), which she performed on November

6   13, 2015 (AR 453).  The results do not appear in the record.

7           10.  William Wang

8       Plaintiff saw orthopedist William Wang for a complete

9   orthopedic evaluation on May 11, 2016.  (AR 266-71.)  Dr. Wang

10  noted that she got into and out of a chair "without difficulty"

11  and had "no apparent ataxia or dyspnea."  (AR 267-68.)  She had

12  "mild tenderness to palpation in the midline of the lumbar spine"

13  and a "slight loss of lordosis."  (AR 268.)  But there was "no

14  CVA[27] tenderness," "evidence of bruits,"[28] or "muscle spasm" and

15  no "pain with range of motion," "axial rotation of the trunk," or

16  "axial loading of the spine at the head."  (Id.)  The straight-

17  leg-raise test was "positive at 40 degrees, both sitting and

18

19  ─────────────

20      [26] Plaintiff apparently stopped working in late 2013,
    although she had fairly substantial unexplained income in 2014.
21  (AR 153, 155.)  It is unclear what "office" she was referring to
    in late 2015.

22
        [27] The costovertebral angle ("CVA") is located on the back
23  at the bottom of the ribcage.  The Costovertebral Angle: What Is
    It and Why Can It Be Painful?, Healthline, https://
24  www.healthline.com/ health/costovertebral-angle (last visited
    Feb. 22, 2021).
25

26      [28] A bruit is a sound heard over an artery or vascular
    channel, reflecting turbulence of flow and most commonly caused
27  by abnormal narrowing of an artery.  Medical Definition of Bruit,
    MedicineNet, https://www.medicinenet.com/bruit/definition.htm
28  (last visited Feb. 22, 2021).

                          22

supine." (Id.) Her "[r]ange of motion of the back [was] 60/90 degrees of forward flexion, 10/25 degrees of extension, 15/25 degrees of lateral flexion to the left, and 15/25 degrees of lateral flexion to the right." (Id.) Dr. Wang noted that the cervical-spine examination revealed "normal curvature without deformity or asymmetry," "50/50 degrees of forward flexion, 60/60 degrees of extension, 45/45 degrees of lateral flexion, bilaterally, and 80/80 rotation bilaterally." (Id.) He also found "no tenderness to palpation in the midline or paraspinal areas"; "no evidence of swelling, palpable mass, or inflammation"; and "no paracervical or bilateral trapezius muscle spasm." (Id.) Her "gait [was] antalgic," but she was "able to perform [a] tandem gait," "stand on [her] toes with some difficulty," "stand on [her] heels," "squat," "get on and off the examination table without difficulty," and "walk across the exam room" without "the use of an assistive device." (AR 269.)

A hip examination revealed "no evidence of trochanteric bursal tenderness to palpation" or "joint deformities." (Id.) Range of motion testing revealed 100/100 degrees of forward flexion, 30/30 degrees of backward extension, 25/25 degrees of abduction, 15/15 degrees of adduction, 30/30 degrees of external rotation bilaterally, and 20/20 degrees of internal rotation bilaterally. (Id.)

A neurological examination revealed "good active motion"; "5/5" strength "in the bilateral lower extremities"; "intact" sensation "to light touch, pinprick, and vibration in the upper and lower extremities"; "2+" deep-tendon reflexes in the bilateral biceps and ankles, "3+" bilateral knee reflexes; no

1  clonus,[29] and a negative Babinski reflex.[30]  (AR 270.)  Finger-to-

2  nose and heel-to-shin tests were normal, and a Romberg test[31] was

3  negative.  (Id.)  Based on the examination, Dr. Wang opined that

4  Plaintiff could lift and carry 20 pounds occasionally and 10

5  pounds frequently, stand and walk for six hours in an eight-hour

6  workday, and sit for six hours in an eight-hour workday.  (AR

7  271.)  She was "occasionally limited in performing climbing,

8  crouching, stooping, and kneeling activities."  (Id.)  He

9  assessed "no manipulative, visual, communicative, or

10  environmental limitations."  (Id.)

11       11.  Anita Pai

12       On June 21, 2016, Plaintiff saw Anita Pai, an orthopedist

13  with Dr. Uppal's practice group.  (AR 473.)  A back examination

14  showed "normal curvature," "tenderness to palpation in the low

15  lumbar area," and "no significant" [sacroiliac] joint

16  tenderness."  (AR 475.)  A neurological examination showed "[n]o

17

18       [29] Clonus is a neurological condition that creates
19  involuntary muscle contractions, primarily in muscles that
    control the knees and ankles.  What Is Clonus, Healthline,
20  https://www.healthline.com/health/clonus (last visited Feb. 22,
    2021).
21

22       [30] "The Babinski reflex occurs after the sole of the foot
    has been firmly stroked."  Babinski Reflex, MedlinePlus, https://
23  medlineplus.gov/ency/article/003294.htm (last visited Feb. 22,
    2021).  "The big toe then moves upward or toward the top surface
24  of the foot."  (Id.)  "The other toes fan out."  (Id.)  "When the
    Babinski reflex is present in a child older than 2 years or in an
25  adult, it is often a sign of a central nervous system disorder."
26  (Id.)

27       [31] The Romberg test measures balance.  Romberg Test,
    Physiopedia, https://www.physio-pedia.com/Romberg_Test (last
28  visited Feb. 22, 2021).

abnormal movement" and "grossly normal" "strength in the bilateral lower extremity," but her "[s]ensation [was] decreased to light touch in the L5 dermatome."  (Id.)  Dr. Pai referred her for physical therapy for 12 visits and advised her to continue her pain medication and follow up with Dr. Cheng.  (AR 476.)  She noted that Plaintiff might benefit from repeat epidural injections if the physical therapy didn't help.  (Id.)

### 12.  Garrett Chapman

On July 13, 2016, Plaintiff saw Dr. Garrett Chapman,[32] complaining of "bilateral shin pain and right thigh pain for . . . 3 years."  (AR 531.)  She reported that she had "not experienced back pain until just 3 months" before physical therapy, Lyrica had "not provided . . . significant relief," and a "workup was negative for shin splints."  (Id.)  Dr. Chapman noted that an x-ray of the spine showed "[n]o scoliosis" and "[m]ild los[s] of lumbar lordosis."  (AR 532.)  He stated that "it d[id] not appear [that] her bilateral shin pain [was] from any spinal pathology," concluded that "[n]o surgical intervention [was] recommended at [that] time," and referred "her to neurology for evaluation of neuropathy vs polyneuropathy which was shown on a previous" EMG.  (AR 533.)

### 13.  Jeffrey Rosenfeld

On August 16, 2016, Plaintiff saw neurologist Jeffrey Rosenfeld for an evaluation.  (AR 555.)  She reported that she

---

[32] Dr. Chapman primarily practices orthopedic surgery.  See Cal. Dep't Consumer Aff. License Search, https:// search.dca.ca.gov (search for "Garrett" with "Chapman" under "License Type," "Physicians and Surgeons") (last visited Feb. 22, 2021).

1 | had right "buttocks 'sciatic' pain with some radiation to the
2 | thigh" and "[s]evere pain in the 'shins' bilaterally." (Id.)
3 | Dr. Rosenfeld noted that an examination revealed "5/5" muscle
4 | strength in all areas; "2+" deep-tendon reflexes bilaterally in
5 | the biceps, triceps, brachrad,[33] and ankle; and "3+" deep-tendon
6 | reflexes bilaterally in the patellar. (AR 558.) Babinski and
7 | Hoffman's[34] reflexes were absent bilaterally. (Id.) He opined
8 | that the "distribution, myalgia and chronicity implicat[ed]
9 | possible myopathy (distal) superimposed on [left-sided]
10 | radiculopathy." (Id.) He ordered several tests, including an
11 | EMG. (AR 558-59.)

12 |     Plaintiff saw Dr. Rosenfeld for a follow-up evaluation on
13 | September 20, 2016. (AR 570-72.) She complained that her pain
14 | had "started radiating to the bottom of both feet"; it was
15 | "exacerbated by palpation of the tibial bone"; and it was reduced
16 | by "elevating legs, heat pads, and [N]orco . . . 4-5 times per
17 | day." (AR 570.) She "denie[d] any shooting pain from her back
18 | . . . to her shins." (Id.) Dr. Rosenfeld noted that the EMG of
19 | the right lower limb was "mildly abnormal," with
20 | "electrophysiologic evidence of chronic neurogenic changes in two
21 | limb muscles of the right L5 myotome that [was] very subtle and

---

23 |     [33] The brachioradialis is a forearm muscle that extends from
24 | the lower part of the humerus to the radius. Brachioradialis
   | Pain, Healthline, https://www.healthline.com/health/
25 | brachioradialis-pain (last visited Feb. 22, 2021).

26 |     [34] A Hoffman's reflex response can indicate spinal-cord
   | compression or another nerve condition. See What Does a Positive
27 | or Negative Hoffman Sign Mean?, Med. News Today, https://
   | www.medicalnewstoday.com/articles/322106.php (last visited Feb.
28 | 22, 2021).

non-diagnostic for a lumbosacral radiculopathy." (Id.)  He
concluded that there was "no electrophysiologic evidence of
myopathy, polyneuropathy, or mononeuropathy in the extensively
tested lower limbs" (id.); the EMG did not "account[] for
[Plaintiff's] pain" (AR 571); and the "[e]xam[ination] and prior
imaging [were] also under[]whelming" (id.).  He noted "[s]ome
signs [of] plantar fascitis" and gave Plaintiff an "[a]mbulatory
referral to Orthotics."  (AR 571-72.)

B.  Plaintiff's Testimony and Statements

In Plaintiff's December 16, 2015 Disability Report, she
stated that she was unable to work because of back, leg, feet,
and neck pain.  (AR 170.)  At the August 28, 2018 hearing, she
testified that she had to spend between 75 and 80 percent of the
day on her sofa with her feet elevated (AR 46-48) and that on bad
days, which she had six days a week (AR 50), she could not "even
get up and go to the restroom" (AR 46).  She testified that she
was able to microwave food, make coffee, grocery shop, and drive
short distances to the store, however.  (AR 47-50.)  She claimed
that although she previously got pain relief by elevating her
legs, that no longer worked and she now also needed a heating pad
and compression socks.  (AR 45.)  Her medications made her
drowsy.  (AR 52-53.)

C.  The ALJ Properly Assessed Plaintiff's RFC

Plaintiff alleges that the ALJ erred in assessing her RFC by
failing "to properly consider significant medical evidence of
record which is supportive of her claim of disability" (J. Stip.
at 4) and improperly assessing physicians' opinions (id. at 5,
9).  For the reasons discussed below, remand is not warranted on

27

1   this issue.

2               1.   Medical evidence of Plaintiff's impairments

3       Plaintiff complains that the ALJ failed to properly consider

4   medical evidence documenting "severe impairments which would

5   prevent Plaintiff from persisting at any full time employment."

6   (J. Stip. at 4.)  She notes that the record demonstrates that she

7   had treatment for venous insufficiency in her legs, degenerative

8   disc disease and degenerative joint disease in the spine, lower-

9   extremity neuropathy/polyneuropathy, and decreased reflexes and

10   sensation in the lower extremities.  (Id. at 4-5.)  But the ALJ

11   recognized and discussed these conditions and the treatment

12   Plaintiff underwent for them — including spine surgery, physical

13   therapy, pain medication, and injections.  (AR 20-22.)  Plaintiff

14   simply summarizes portions of the record evidencing her treatment

15   for these conditions; she offers no argument, much less evidence,

16   as to what specific treatment the ALJ failed to consider or how

17   any of these conditions caused limitations greater than those

18   included in her RFC.  Although she points to her own statements

19   that she needed to elevate her legs, she offers no evidence that

20   any doctor assigned any such limitation.  Moreover, as discussed

21   in section V.D., the ALJ properly discounted Plaintiff's

22   subjective symptom statements.  Based on the record and

23   Plaintiff's failure to identify any flaw in the ALJ's reasoning,

24   the ALJ adequately considered the medical evidence of Plaintiff's

25   impairments.  See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th

26   Cir. 2005) (ALJ not required to include in RFC limitations based

27   on plaintiff's properly discounted subjective complaints);

28   Figueroa v. Colvin, No. CV 12-067420-OP., 2013 WL 1859073, at *9

1  (C.D. Cal. May 2, 2013) (no error in failing to include

2  limitations in RFC when ALJ properly rejected plaintiff's

3  subjective complaints of impairment).

4           2.  Medical opinions

5       Plaintiff argues that the ALJ erred in assessing the

6  physicians' opinions.  (J. Stip. at 5, 9.)  For the reasons

7  discussed below, remand is not warranted.

8              a.  *Applicable law*

9       Three types of physicians may offer opinions in Social

10  Security cases: those who directly treated plaintiff, those who

11  examined but did not treat her, and those who did neither.  See

12  Lester, 81 F.3d at 830.  A treating physician's opinion is

13  generally entitled to more weight than an examining physician's,

14  and an examining physician's opinion is generally entitled to

15  more weight than a nonexamining physician's.  Id.; see

16  § 404.1527(c)(1)-(2).[35]  But "the findings of a nontreating,

17  nonexamining physician can amount to substantial evidence, so

18  long as other evidence in the record supports those findings."

19  Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam)

20  (as amended).

21       The ALJ may discount a physician's opinion regardless of

22  whether it is contradicted.  Magallanes v. Bowen, 881 F.2d 747, 751

23  (9th Cir. 1989); see also Carmickle v. Comm'r, Soc. Sec. Admin., 533

24  F.3d 1155, 1164 (9th Cir. 2008).  When a doctor's opinion is not

25

26       [35] For claims filed on or after March 27, 2017, the rules in
§ 404.1520c (not § 404.1527) apply.  See § 404.1520c (evaluating
27  opinion evidence for claims filed on or after Mar. 27, 2017).
Plaintiff's claims were filed before March 27, 2017, however, and
28  the Court therefore analyzes them under former § 404.1527.

contradicted by other medical-opinion evidence, however, it may be
rejected only for a "clear and convincing" reason.  Magallanes, 881
F.2d at 751 (citations omitted); Carmickle, 533 F.3d at 1164 (citing
Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ need
provide only a "specific and legitimate" reason for discounting it.
Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31).  The
weight given a doctor's opinion, moreover, depends on whether it is
consistent with the record and accompanied by adequate explanation,
among other things.  See § 404.1527(c); see also Orn v. Astrue, 495
F.3d 625, 631 (9th Cir. 2007) (factors in assessing physician's
opinion include length of treatment relationship, frequency of
examination, and nature and extent of treatment relationship).

### b.   *Dr. Uppal*

On March 25, 2014, Dr. Uppal opined that Plaintiff should be
on disability for six months.  (AR 458.)  On February 10, 2015,
he said she should be on disability for four weeks and should not
"do any significant bending, stooping, [or] lifting" (AR 462); he
also noted that she was on Norco, which caused "further
depression and lack of concentration" (id.).  Finally, on March
8, 2016, he stated that he did "not feel she [was] going to
return . . . to work."  (AR 471.)  The ALJ afforded these
opinions "little weight."  (AR 24.)

As the ALJ noted, Dr. Uppal did not include any function-by-
function limitations that would prevent Plaintiff from working
except in the February 2015 opinion.  (See id.)  And the
functional limitations included in that opinion were vague
because they restricted only "significant" performance of those
activities without defining the term.  (AR 462.)  This alone was

1  sufficient to reject Dr. Uppal's disability findings.  See Ford
2  v. Saul, 950 F.3d 1141, 1156 (9th Cir. 2020) ("ALJ found that
3  [physician's] descriptions of [plaintiff's] ability to perform in
4  the workplace as 'limited' or 'fair' were not useful because they
5  failed to specify [his] functional limits," and therefore ALJ
6  could "reasonably conclude these characterizations were
7  inadequate for determining RFC").  In any event, the ALJ limited
8  Plaintiff to "occasional" posturals and lifting of up to 20
9  pounds, thereby essentially adopting much of Dr. Uppal's
10 "significant" restriction.

11     The ALJ also noted that Dr. Uppal's opinions were "not
12 supported by objective evidence," were "inconsistent with the
13 record as a whole," and "demonstrate[d] a lack of understanding
14 of social security disability programs and evidentiary
15 requirements."  (AR 24.)  Indeed, Dr. Uppal did not support his
16 opinion that Plaintiff was disabled with any explanation other
17 than to state that she was on pain medication and having back
18 spasms.  (See AR 458.)  An ALJ "need not accept the opinion of
19 any physician, including a treating physician, if that opinion is
20 brief, conclusory, and inadequately supported by clinical
21 findings."  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002)
22 (citation omitted); see also Ford, 950 F.3d at 1155 ("An ALJ is
23 not required to take medical opinions at face value, but may take
24 into account the quality of the explanation when determining how
25 much weight to give a medical opinion.").

26     Plaintiff offers no meaningful challenge to the ALJ's
27 assessment of Dr. Uppal's opinions.  No error occurred.

28

31

c.  *State-agency doctors*

On May 11, 2016, Plaintiff attended an orthopedic evaluation with Dr. Wang.  (AR 266-71.)  He opined that she could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk for six hours in an eight-hour workday; could sit for six hours in an eight-hour workday; was occasionally limited in climbing, crouching, stooping, and kneeling activities; and had no manipulative, visual, communicative, or environmental limitations.  (AR 271.)

On May 26, 2016, D. Haaland, a state-agency reviewing physician,[36] evaluated portions of Plaintiff's medical records, including some of Dr. Kim's treatment records and Dr. Wang's May 11 report.  (AR 60-63.)  Dr. Haaland opined that Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk for a total of about six hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday; had no pushing, pulling, balancing, manipulative, visual, communicative, or environmental limitations; could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; and could never climb ladders, ropes, or scaffolds.  (AR 64-65.)

---

[36] Dr. Haaland used a medical specialty code of 29 (AR 68), indicating orthopedics, see Soc. Sec. Admin., Program Operations Manual System (POMS) DI 24501.004 (May 5, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004 (last visited Feb. 22, 2021).

On July 15, 2016, H.M. Estrin, also a state-agency reviewing physician,[37] reviewed the same records as Dr. Haaland and assessed the same limitations.  (AR 74-75.)

The ALJ gave the assessments of Dr. Wang and the state-agency reviewing physicians "significant weight" (AR 23), finding that they were

> generally reasonable and consistent with the objective medical evidence, which shows a history of treatment for degenerative disc disease with some evidence of radicular pain, worse in the right lower extremity, with no indication of significant neurological deficits, gait abnormalities, or significant physical limitations caused by these impairments.

(AR 24.)

Plaintiff again offers no meaningful challenge to the ALJ's assessment of these opinions.  She merely argues that the medical evidence of record does not support the opinion that Plaintiff had the ability to persist at light-work activity.  (J. Stip. at 9.)  But she does not explain what evidence in the record conflicts with that opinion.  And Dr. Wang performed and relied on his own objective medical tests, including straight leg raise, range of motion, strength, sensation, and reflex.  (AR 268-70.) The state-agency physicians relied on Dr. Wang's objective medical tests and opinion and reviewed other medical evidence as well.  (AR 60, 70.)  Those opinions, therefore, constituted

---

[37] Dr. Estrin used a medical specialty code of 19 (AR 78), indicating internal medicine, see POMS DI 24501.004, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

1  substantial evidence that the ALJ appropriately credited.

2  Saelee, 94 F.3d at 522.  Plaintiff has not pointed to any way in

3  which the ALJ erred.  Remand is not required on this issue.

4        D.    The ALJ Properly Assessed Plaintiff's Subjective

5              Symptom Statements

6        Plaintiff asserts that the ALJ failed to properly evaluate

7  her subjective symptom statements.  (J. Stip. at 15-18.)  For the

8  reasons discussed below, the ALJ did not err.

9              1.    Applicable law

10       An ALJ's assessment of a claimant's allegations concerning

11  the severity of her symptoms is entitled to "great weight."

12  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended)

13  (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir.

14  1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not 'required to

15  believe every allegation of disabling pain, or else disability

16  benefits would be available for the asking, a result plainly

17  contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina v. Astrue, 674

18  F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d

19  597, 603 (9th Cir. 1989)).

20       In evaluating a claimant's subjective symptom testimony, the

21  ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d

22  at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16,

23  2016).  "First, the ALJ must determine whether the claimant has

24  presented objective medical evidence of an underlying impairment

25  '[that] could reasonably be expected to produce the pain or other

26  symptoms alleged.'"  Lingenfelter, 504 F.3d at 1036 (citation

27  omitted).  If such objective medical evidence exists, the ALJ may

28  not reject a claimant's testimony "simply because there is no

1  showing that the impairment can reasonably produce the <u>degree</u> of

2  symptom alleged."  <u>Id.</u> (citation omitted; emphasis in original).

3      If the claimant meets the first test, the ALJ may discount

4  the claimant's subjective symptom testimony only if she makes

5  specific findings that support the conclusion.  <u>See</u> <u>Berry v.</u>

6  <u>Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or

7  affirmative evidence of malingering, the ALJ must provide a

8  "clear and convincing" reason for rejecting the claimant's

9  testimony.  <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 493 (9th Cir.

10 2015) (as amended) (citing <u>Lingenfelter</u>, 504 F.3d at 1036);

11 <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1102 (9th

12 Cir. 2014).  The ALJ may consider, among other factors, the

13 claimant's (1) reputation for truthfulness, prior inconsistent

14 statements, and other testimony that appears less than candid;

15 (2) unexplained or inadequately explained failure to seek

16 treatment or to follow a prescribed course of treatment; (3)

17 daily activities; (4) work record; and (5) physicians' and third

18 parties' statements.  <u>Rounds v. Comm'r Soc. Sec. Admin.</u>, 807 F.3d

19 996, 1006 (9th Cir. 2015) (as amended); <u>Thomas</u>, 278 F.3d at 958-

20 59 (citation omitted).  If the ALJ's evaluation of a plaintiff's

21 alleged symptoms is supported by substantial evidence in the

22 record, the reviewing court "may not engage in second-guessing."

23 <u>Thomas</u>, 278 F.3d at 959.

24           2.   The ALJ's decision

25     The ALJ reviewed Plaintiff's claimed limitations and found

26 that her "medically determinable impairments could reasonably be

27 expected to cause some of the alleged symptoms; however, [her]

28 statements concerning the intensity, persistence and limiting

effects of these symptoms [were] not entirely consistent with the
medical evidence and other evidence in the record[.]"  (AR 20.)
The ALJ discounted Plaintiff's subjective symptom statements
because they were inconsistent with the objective medical
evidence (id.); she had received routine, conservative,
nonemergency treatment (AR 20, 22-23); her treatment had been
"relatively effective" in controlling her symptoms (AR 23); and
she had made statements to her doctor regarding her functioning
and symptoms that were inconsistent with her allegations of
disability (id.).

### 3.  Analysis

#### a.  *Medical and other evidence*

To start, the ALJ properly concluded that Plaintiff's
subjective symptom statements were inconsistent with the
objective medical evidence in the record, a finding Plaintiff has
not challenged on appeal other than to point out that that can't
serve as the only reason for an ALJ to discount a plaintiff's
statements and testimony.  (AR 20-23; see also J. Stip. at 16);
Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir.
1999) (finding "conflict" with "objective medical evidence in the
record" to be "specific and substantial reason" undermining
plaintiff's allegations); § 404.1529(c)(2); see also Ruiz v.
Comm'r of Soc. Sec., 490 F. App'x 907, 908 (9th Cir. 2012)
(plaintiff conceded four of five reasons ALJ gave for rejecting
examining doctor's opinion by not addressing them in briefing).
Among other things, the ALJ noted that although Plaintiff claimed
she had difficulty walking because of pain (see, e.g., AR 267),
she was often noted to ambulate with a normal gait and was never

1  prescribed an assistive device (AR 22-23 (citing AR 637)).  The
2  ALJ also correctly noted that there was no evidence of loss of
3  motor strength in the lower extremities or muscle atrophy, and
4  examination findings were generally mild to moderate.  (AR 22-23;
5  see AR 223, 558.)

                    b.    Effective treatment

7       The ALJ also discounted Plaintiff's subjective symptom
8  statements because they were inconsistent with evidence
9  demonstrating that her treatment and medications had been
10 "relatively effective."  (AR 23.)  As the ALJ noted, Plaintiff
11 regularly reported that compression stockings, physical therapy,
12 and medication improved her pain.  (AR 20-21 (citing AR 212, 225,
13 254).)  On numerous occasions, she rated her pain from none to
14 between one and three out of 10 and denied medication side
15 effects.  (AR 21-23 (citing AR 233, 252, 254, 421, 541, 669,
16 682).)  And even when she reported more serious pain, she
17 generally said she had fair to excellent functioning.  (AR 21-23
18 (citing AR 236-37, 242, 252).)

19      Plaintiff argues that her epidural injections demonstrate
20 that her treatment was not effective.  But that she occasionally
21 needed more aggressive treatment does not diminish the numerous
22 times when she acknowledged that her medication was working.  At
23 most, the records cited by Plaintiff establish that the medical
24 evidence was susceptible of more than one rational
25 interpretation, which is insufficient to warrant reversal.  See
26 Molina, 674 F.3d at 1111; Tommasetti v. Astrue, 533 F.3d 1035,
27 1041 (9th Cir. 2008) (ALJ is "final arbiter with respect to
28 resolving ambiguities in the medical evidence").  The ALJ

                              37

properly considered this evidence in discounting Plaintiff's symptom statements.

*c.   Plaintiff's inconsistent statements*

Finally, the ALJ properly discounted Plaintiff's subjective symptom statements because some of them were inconsistent with other statements she made to her treatment providers.  Rounds, 807 F.3d at 1006 (listing prior inconsistent statement as factor ALJ may consider in assessing claimant's testimony).  To start, Plaintiff testified that she had to spend between 75 and 80 percent of the day on her sofa with her feet elevated (AR 46-48) and that on bad days — which occurred six days a week (AR 50) — she could not "even get up and go to the restroom" (AR 46), but she often reported fair or good physical functioning to her treatment providers (see AR 215, 222, 236, 242, 252, 541).  And although she testified that she got drowsy and slept after taking her pain medication (AR 52-53), which was the same Norco she had been taking for years (AR 45, 455),[38] she repeatedly denied to her treatment providers that she had any medication side effects (see, e.g., AR 233, 262, 505, 581).

Substantial evidence supported the ALJ's discounting of Plaintiff's subjective symptom statements.  Remand is not warranted on this basis.[39]

---

[38] Indeed, at the time of the hearing Plaintiff was taking fewer Norco than she had when she was working.  (See AR 52, 455.)

[39] The ALJ also discounted Plaintiff's subjective symptom statements because they were inconsistent with her "conservative" treatment.  (AR 20, 22-23.)  Plaintiff's treatment was likely not conservative.  See, e.g., Lapeirre-Gutt v. Astrue, 382 F. App'x

(continued...)

1

**VI.   CONCLUSION**

Consistent with the foregoing and under sentence four of 42
U.S.C. § 405(g),[40] IT IS ORDERED that judgment be entered
AFFIRMING the Commissioner's decision, DENYING Plaintiff's
request for remand, and DISMISSING this action with prejudice.


DATED: February 23, 2021                    _____
                                            JEAN ROSENBLUTH
                                            U.S. Magistrate Judge

_____

[39] (...continued)
662, 664 (9th Cir. 2010) (treatment with narcotic pain
medication, occipital nerve blocks, trigger-point injections, and
cervical-fusion surgery not conservative); Samaniego v. Astrue,
No. EDCV 11-865 JC, 2012 WL 254030, at *4 (C.D. Cal. Jan. 27,
2012) (treatment not conservative when claimant was treated "on a
continuing basis" with steroid and anesthetic "trigger point
injections," occasional epidural injections, and narcotic
medication and doctor recommended surgery); Ruiz v. Berryhill,
No. CV 16-2580-SP, 2017 WL 4570811, at *5-6 (C.D. Cal. Oct. 11,
2017) (treatment by "narcotic medication, facet joint injections,
and epidural steroid injections" not conservative).  Because the
ALJ provided other clear and convincing reasons for discounting
her statements, however, remand is not necessary.  See Larkins v.
Colvin, 674 F. App'x 632, 633 (9th Cir. 2017) ("[B]ecause the ALJ
gave specific, clear and convincing reasons [for discounting
plaintiff's symptom statements], any error in the additional
reasons the ALJ provided . . . was harmless." (citation
omitted)).

[40] That sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."